**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

Charles Wayne Marietta,

                    Plaintiff,

v.

Unknown LoBeu, et al.,

                    Defendants.

No.  CV 18-08064-PCT-MTL (CDB)

**ORDER**

Plaintiff Charles Wayne Marietta, who is currently confined in the Arizona State Prison (ASP)-Kingman, brought this civil rights action pursuant to 42 U.S.C. § 1983. Defendants Correct Care Solutions, LLC ("CCS"), Sumi Erno, and Leanne LoBue[1] move for summary judgment.  (Doc. 26.)  Plaintiff was informed of his rights and obligations to respond pursuant to *Rand v. Rowland*, 154 F.3d 952, 962 (9th Cir. 1998) (en banc) (Doc. 28), and he opposes the Motion.  (Doc. 35.)

The Court will grant the Motion for Summary Judgment.

**I.      Background**

On screening the Complaint under 28 U.S.C. § 1915A(a), the Court determined that Plaintiff stated Eighth Amendment deliberate indifference claims against Defendants CCS, LoBue, and Erno, and directed them to answer the claims.  (Doc. 7.)

. . . .

---

[1] Plaintiff's spelling of LoBue's name in the Complaint is incorrect; the Court will use the correct spelling indicated by Defendants.

In the Complaint, filed on March 22, 2018, Plaintiff alleges that Defendant CCS has a policy and practice of intentionally and unnecessarily delaying needed appointments within the prison and with outside specialists and failing to follow specialists' diagnostic and treatment plans. (Doc. 1.) Plaintiff asserts that Defendant LoBue is aware of his serious medical needs but has failed to treat them and has ignored other providers' orders for testing and treatment. (*Id.*) Plaintiff claims Defendant Erno is aware of Plaintiff's serious medical needs but has ignored Plaintiff's requests for care, unnecessarily delayed and rescheduled Plaintiff's appointments for treatment, and ignored outside specialists' orders and instructions.[2] (*Id.*)

## II. Summary Judgment Standard

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The movant bears the initial responsibility of presenting the basis for its motion and identifying those portions of the record, together with affidavits, if any, that it believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323.

If the movant fails to carry its initial burden of production, the nonmovant need not produce anything. *Nissan Fire & Marine Ins. Co.*, *Ltd. v. Fritz Co.*, *Inc.*, 210 F.3d 1099, 1102-03 (9th Cir. 2000). But if the movant meets its initial responsibility, the burden shifts to the nonmovant to demonstrate the existence of a factual dispute and that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmovant. *Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 248, 250 (1986); *see Triton Energy Corp. v. Square D. Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995). The nonmovant need not establish a material issue of fact conclusively in its

---

[2] On February 11, 2019, Plaintiff filed a Motion to Modify the Scheduling Order and Motion to Extend and Reopen Discovery, based on events that had allegedly occurred between January 3 and 9, 2019. (Doc. 23.) In a March 12, 2019 Order, Magistrate Judge Bibles denied Plaintiff's Motion, concluding that Plaintiff had not shown good cause for reopening discovery. (Doc. 25.)

favor, *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288-89 (1968); however, it must "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal citation omitted); *see* Fed. R. Civ. P. 56(c)(1).

At summary judgment, the judge's function is not to weigh the evidence and determine the truth but to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249. In its analysis, the court must believe the nonmovant's evidence and draw all inferences in the nonmovant's favor. *Id.* at 255. The court need consider only the cited materials, but it may consider any other materials in the record. Fed. R. Civ. P. 56(c)(3).

### III. Facts[3]

Plaintiff is a prisoner in the Arizona Department of Corrections (ADC) and is incarcerated in the Huachuca Unit at ASP-Kingman. (Doc. 27 at 1 ¶ 1.)[4] Defendant CCS provided healthcare services to Plaintiff at ASP-Kingman. (*Id.* ¶ 2.) Defendant Erno was employed by CCS as a Health Services Administrator (HSA). (*Id.* ¶ 3.) Defendant LoBue was employed by CCS as a medical provider. (*Id.* ¶ 4.)

In June 2014, while he was in ADC custody, Plaintiff was diagnosed with 40 to 60% stenosis of the right renal artery. (Doc. 35 at 1-2; Doc. 37 at 8.) In November 2014, Plaintiff underwent a left femoral bypass and left femoral thromboendarterectomy. (Doc. 37 at 10.) In April 2015, Plaintiff underwent insertion of a femoral stent. (*Id.* at 12.) In December 15, 2015, Plaintiff was transferred to ASP-Kingman Huachuca Unit. (*Id.* at 2.) When he was transferred, Plaintiff told a Huachuca Unit nurse about his medical issues, but for several months, "nothing was scheduled" for evaluation of his conditions. (*Id.*)

Between June 21, 2016 and September 14, 2016, Plaintiff submitted four Health Needs Requests asserting that he was experiencing pain on his right side, dark-colored urine, and severe chest pain and requesting evaluation. (*Id.* at 2, 14, 16, 18; Doc. 37-1 at

---

[3] The facts are primarily taken from Plaintiff's medical records.

[4] The citation refers to the document and page number generated by the Court's Case Management/Electronic Case Filing system.

15.) On September 16, 2016, Plaintiff was transported to the emergency room for chest pain. (Doc. 44-1 at 28.) He was discharged the same day. (*Id.*) Plaintiff's was referred offsite to see a cardiologist, and on October 17, 2016, Plaintiff saw Dr. S. Ismail Bokhari, who requested that Plaintiff undergo an echocardiogram and cardiolite nuclear stress test. (Doc. 44-1 at 82; Doc. 44-2 at 31, 34.) On November 16, 2016, Dr. Donovan Schmidt, an ADC doctor, submitted an urgent request for the testing Dr. Bokhari recommended. (Doc. 44-2 at 32.)

On March 7, 2017, Plaintiff underwent a transthoracic echocardiogram and a myocardial perfusion stress test, which showed a "fixed defect" and an old myocardial infarction but no evidence of ischemia. (Doc. 27-1 at 61, 63, 65.) On April 19, 2017, Plaintiff saw Dr. Bokhari. (*Id.* at 65.) Plaintiff reported that he was feeling "much better" and denied chest pain, pressure, and unusual shortness of breath. (*Id.*) Dr. Bokhari reviewed the March 7, 2017 test results, noted that Plaintiff did not know he had a myocardial infarction, and recommended that Plaintiff be started on a statin (atorvastatin) and metoprolol. (*Id.* at 68-69.) On April 19, 2017, Plaintiff was seen offsite by a cardiothoracic surgeon. (Doc. 44-1 at 85.)

On May 30, 2017, Plaintiff had a video visit with Dr. Stephanie Kokseng, a doctor at ASP-Kingman Huachuca Unit. (Doc. 37 at 3; Doc. 37-1 at 5.) Dr. Kokseng requested an outside consultation with a vascular surgeon for Plaintiff's unaddressed renal artery stenosis. (Doc. 37-1 at 5.) On August 21, 2017, Defendant Erno completed an Inmate Informal Complaint Response to an Inmate Informal Complaint Resolution Plaintiff had apparently filed regarding Plaintiff's request to see a provider.[5] (Doc. 37-2 at 18.) Erno wrote in the Response that a review of Plaintiff's chart had been conducted and she had placed Plaintiff on the provider line for that week. (*Id.*) Erno also apologized that Plaintiff "ke[pt] getting canceled on the provider line" and stated she would ensure it did not happen again. (*Id.*)

---

[5] It appears the parties did not submit a copy of the Inmate Informal Complaint Resolution.

On August 22, 2017, Defendant LoBue entered a request for an offsite referral for Plaintiff to see a vascular surgeon for his "known CAD & PVD" and his unaddressed renal artery stenosis (Doc. 44-1 at 88.) The request was approved the next day. (*Id.*) LoBue also entered a request for an offsite referral for Plaintiff to undergo a CT of his brain for his peripheral vascular disease and intermittent dizziness and disorientation. (Doc. 44-1 at 69; Doc. 44-2 at 28.) On August 23, 2017, a note was entered that states that the status of the request to see a vascular surgeon was changed to "alternate treatment" and "Dr. Kokseng, When did he have a CVA? Residual? Current medications? Has he had a carotid ultrasound?"[6] (Doc. 44-1 at 69.)

On September 18, 2017, Defendant LoBue sent Plaintiff a Health Services Communique stating that the referral to a vascular surgeon had been approved and would be scheduled. (Doc. 37-2 at 13.) On September 26, 2017, Defendant Erno wrote to Plaintiff that she had received Plaintiff's grievance regarding his "request for surgery on [his] legs." (Doc. 37-3 at 2.) Erno stated that Plaintiff had been informed that the referral to a vascular surgeon had been approved, that Plaintiff would be scheduled, and to allow "a few weeks for this [to] occur." (*Id.*)

On December 27, 2017, Plaintiff saw Dr. Dunning, a cardiologist, for evaluation of renal artery stenosis. (Doc. 27-1 at 71.) Plaintiff described discomfort suggestive of angina but had no "TIA or stroke-like symptoms." (*Id.*) Dr. Dunning determined that Plaintiff had "no symptoms attributable to valvular heart disease" and ordered a renal artery ultrasound, an exercise myocardial perfusion, and a 2-D Echo. (*Id.* at 73.) Defendant LoBue signed the notes from the visit on January 4, 2018. (*Id.* at 71.)

On December 28, 2017, Plaintiff saw Defendant LoBue. (Doc. 27-1 at 8.) Plaintiff complained of frequent urination, suprapubic pain, nausea, and blood in his urine (hematuria) for the previous two years. (*Id.*) LoBue ordered a urine sample to be sent for urinalysis and placed Plaintiff on the provider line. (*Id.*) The urine sample obtained was

---

[6] On March 1, 2018, the status of the request was changed from alternate treatment to "close," with a note stating, "Closing referral per site request on 3/1/18." (Doc. 44-1 at 69.)

cloudy and "tea colored" and contained blood.  (*Id.*)

On December 30, 2017, Plaintiff was transported to the emergency room for right-sided flank pain and bloody urine for the previous seven days.  (Doc. 27-1 at 10.)  Plaintiff reported that his right-side flank pain radiated to the right side of his abdomen and that he had hematuria.  (*Id.*)  Plaintiff also reported that he had experienced one episode of non-bloody vomiting and that six or seven months earlier, he intermittently experienced flank pain, but the flank pain had been constant for the last seven days.  (*Id.*)  Plaintiff denied experiencing hematuria previously and reported that he had passed a kidney stone four or five months earlier.  (*Id.*)  A urinalysis showed Plaintiff had protein and blood in his urine.  (*Id.* at 15.)  An abdominal CT angiogram (CTA) showed an obstructing 8 mm calculus in the proximal right ureter, high-grade stenosis at the origin of the right renal artery, and a small left renal cortical cyst.  (*Id.* at 17.)  An EKG showed an old inferior infarction.  (*Id.* at 18.)  Plaintiff was diagnosed with a urinary tract obstruction due to a kidney stone.  (*Id.*)  He was instructed to follow up with a urologist in one or two days and was prescribed Flomax to help him pass the kidney stone.  (*Id.* at 19, 24.)  Defendant LoBue signed the report from the hospital visit and the discharge instructions on January 3, 2018.  (*Id.* at 10, 24.)

On January 3, 2018, Plaintiff saw Defendant LoBue.  (Doc. 27-1 at 30.)  LoBue reviewed the hospital notes and Plaintiff's lab test and imaging results.  (*Id.*)  She also requested an offsite referral for Plaintiff to see a urologist, which was approved on January 5, 2018.  (Doc. 44-1 at 91.)  The next day, Plaintiff saw LoBue for follow-up from the abnormal urine dip and his hospital visit.  (Doc. 27-1 at 32.)  LoBue noted that that the urine dip showed "small blood" in Plaintiff's urine, that Plaintiff had a kidney stone, and that there would be "no other intervention."  (*Id.*)  On January 4, 2018, LoBue requested an offsite referral for Plaintiff to undergo an echocardiogram for his atherosclerosis of the native arteries and hypertension.  (Doc. 44-1 at 72.)  LoBue also requested an offsite referral for Plaintiff to undergo a nuclear medicine stress test and a bilateral renal

ultrasound.[7]  (*Id.* at 75, 78.)  All three requests were approved on January 5, 2018.  (*Id.* at 72, 75, 78.)

On January 22, 2018, Plaintiff was seen by a urologist and it was recommended that he undergo cystoscopy with stent placement.  (Doc. 27-1 at 34.)  The same day, LoBue requested an offsite referral for Plaintiff to undergo stent placement surgery for calculus in his kidney and atherosclerosis of the rental artery, which was approved.  (Doc. 44-1 at 25.)  On February 2, 2018, Plaintiff submitted an HNR stating that he was having pain and numbness in both arms and hands and pain in the sides of his head.  (Doc. 37-2 at 16.)  Plaintiff wrote that three tests had been ordered in June 2016 and approved in September 2016, but none of those tests had been scheduled "per" Defendant Erno, who Plaintiff asserted had told him they would be scheduled.[8]  (*Id.*)  Plaintiff asked to be scheduled for the angiogram and CT scan.  (*Id.*)  The Plan of Action on the HNR noted that Plaintiff had been examined and interviewed and was referred to Defendant LoBue.  (*Id.*)

On February 5, 2018, Defendant LoBue submitted a referral request for offsite services for Plaintiff to receive the cystoscopy with stent placement.  (Doc. 27-1 at 34.)  On February 20, 2018, Plaintiff underwent a transthoracic echocardiogram with complete 2D, M-Mode, and Doppler examination.  (*Id.* at 76.)  The conclusions were that the mitral valve annulus appeared to be calcified; the mitral valve leaflets appeared mildly thickened; and the aortic valve appeared to be calcified or thickened.  (*Id.* at 77.)

On March 1, 2018, Defendant LoBue entered a note in a Continuous Progress Record for Plaintiff, stating that in May 2017, Dr. Kokseng had requested a CT of Plaintiff's brain because he reported he had been experiencing dizziness and disorientation.  (Doc. 37-1 at 9.)  The note stated that on August 23, 2017, Dr. Keldia had "deferred

---

[7] Plaintiff's medical records indicate the first two referrals were marked as "complete" on March 13, 2018.  (Doc. 44-1 at 72, 75.)  The third referral—for the renal ultrasound—was marked as complete on February 7, 2018.  (*Id.* at 78.)

[8] Plaintiff's available medical records do not show that three tests were ordered in June 2016 and approved in September 2016.  As noted above, on September 18, 2017, Defendant LoBue notified Plaintiff that the referral to a vascular surgeon had been approved and would be scheduled.  (Doc. 37-2 at 13.)

requesting" the CT scan. (*Id.*) The note also stated that the request for the CT scan had been "stagnant" since August 2017, and that a review showed Plaintiff had no further complaints of dizziness over the past 10 months. (*Id.*) The note indicated that Plaintiff had a history of cerebrovascular accident with residual deficit, or a stroke, and that a carotid ultrasound had been requested or performed; it is unclear from the note whether or how those conditions related to Dr. Kokseng's request for a CT scan of Plaintiff's brain. (*Id.*) Defendant LoBue noted that she would close the request for the CT scan. (*Id.*)

On March 5, 2018, Plaintiff underwent stent placement surgery with Dr. Mynatt, a urologist. (Doc. 27-1 at 36.) On March 12, 2018, Defendant LoBue requested offsite follow-up with the urologist between March 13 and March 16, 2018, which was approved. (*Id.* at 38; Doc. 44-1 at 97.) She also requested offsite follow-up with the cardiologist, which was approved. (Doc. 44-1 at 101.) On March 16, 2018, Plaintiff had a follow-up visit with Dr. Mynatt, and the stent was removed. (Doc. 27-1 at 40.) Plaintiff was instructed to strain his urine for stone fragments and return in a couple of weeks. (*Id.*) The same day, Plaintiff saw LoBue when he returned from the appointment with Dr. Mynatt. (*Id.* at 46.)

On March 19, 2018, LoBue requested "paperwork for review." (*Id.*) On March 22, 2018, LoBue received the notes from the March 5, 2018 surgery. (*Id.* at 48.) The next day, Plaintiff submitted an HNR asking when his right renal stenosis would be addressed and treated and when he could expect an angiogram to be done to determine where the blockage was that caused his heart attack and mini-strokes. (Doc. 37 at 20.) The response to the HNR stated that Plaintiff had been referred offsite and the referral was awaiting approval. (*Id.*)

On March 23, 2018, Plaintiff submitted an Inmate Letter to Defendant Erno. (Doc. 37-1 at 3.) Plaintiff wrote in the Inmate Letter that he had informed Erno on September 17, 2017 and January 1, 2018 of his right renal artery stenosis. (*Id.*) Plaintiff also wrote that Erno had responded to one HNR and stated that she had received his request for surgery "on [his] legs," but Plaintiff had requested surgery for the artery to his right kidney. (*Id.*)

Plaintiff asserted that his right renal artery stenosis, which had been "acknowledged" by the urologist and radiologist, had not been addressed. (*Id.*) Plaintiff further stated that although Dr. Kokseng had "ordered the appropriate test," which had been approved in September 2017, "it has been the opinion of the medical unit to cancel" those orders. (*Id.*) Plaintiff did not indicate in the Inmate Letter that Defendant LoBue had canceled Dr. Kokseng's order. (*See id.*) Plaintiff requested that Erno respond as to whether he would be scheduled for treatment for this "known condition," which he had "relayed" to Huachuca Unit when he arrived there in 2015. (*Id.*)

On March 27, 2018, LoBue noted that she had received the notes from Plaintiff's March 16, 2018 follow-up visit with Dr. Mynatt and that Plaintiff was to follow up with urology in two weeks. (Doc. 27-1 at 48.) LoBue requested an offsite referral for Plaintiff to see the urologist for follow-up. (Doc. 44-1 at 105.) The request was approved on March 30, 2018.

On April 6, 2018, Plaintiff saw Dr. Mynatt for follow-up. (*Id.* at 50.) Plaintiff reported that he had passed multiple fragments and was still having some right flank pain. (*Id.*) Dr. Mynatt noted that this would be followed, and if Plaintiff was still having pain in a couple of weeks, a repeat CT scan would be considered. (*Id.*) Dr. Mynatt and Plaintiff also discussed obtaining "24 hour urine through litho-link at some point for crystal evaluation." (*Id.*) Defendant LoBue reviewed the urology note on April 11, 2018 and noted that Plaintiff needed to follow up in two weeks. (*Id.* at 54.) LoBue also entered a request for an offsite referral for Plaintiff to follow-up with Dr. Mynatt in two weeks. (Doc. 44-1 at 108; Doc. 44-2 at 51.)

On April 13, 2018, Defendant Erno responded to Plaintiff's March 23, 2018 Inmate Letter. (Doc. 37-1 at 2.) Erno noted that Plaintiff's record had been reviewed, he had been seen by the urologist on April 6, 2018, the provider had requested the results of that visit, and as soon as the results were received, the provider would notify Plaintiff. (*Id.*) It does not appear from the available records that Plaintiff had any further interaction with Erno.

On April 19, 2018, Plaintiff submitted an HNR complaining he had experienced

five episodes of TIAs (transient ischemic attacks), or "mini-strokes," over the previous six months. (Doc. 37 at 3; Doc. 37-1 at 11.) Plaintiff wrote in the HNR that he had had "an attack" the day before and another the day he submitted the HNR. (Doc. 37-1 at 11.) Plaintiff stated that Dr. Kokseng had ordered a CT scan in June 2017, which had been approved, but after reviewing his records, Plaintiff learned that Defendant LoBue had closed out the order on March 1, 2018. (*Id.*) Plaintiff requested to be scheduled to be seen at medical. (*Id.*) The response to the HNR stated that Plaintiff was to be scheduled on the nurse's line. (*Id.*)

The same day, Plaintiff saw Dr. S. Ismail Bokhari, an offsite cardiologist. (Doc. 27-1 at 79.) Dr. Bokhari noted that a cardiac stress test did not show any evidence of ischemia, but it did suggest inferior wall myocardial infarction. (*Id.*) Dr. Bokhari also "reassured" Plaintiff that his 60% renal artery stenosis did not need further treatment. (*Id.*) Dr. Bokhari ordered an EKG and recommended that Plaintiff be scheduled for a carotid ultrasound. (*Id.* at 81-82.) On April 19, 2018, Defendant LoBue requested that Plaintiff be sent offsite for a carotid ultrasound and to see a cardiologist for his TIAs. (Doc. 44-1 at 4, 111.) She also requested a follow-up appointment with Dr. Bokhari in six months. (Doc. 44-2 at 50.)

On April 24, 2018, Plaintiff saw Dr. Mynatt, the urologist, for follow-up. (Doc. 27-1 at 56.) Dr. Mynatt noted that Plaintiff's pain from the stent placement surgery had been alleviated and there was no need for a repeat CT scan. (*Id.*) Dr. Mynatt and Plaintiff again discussed 24-hour urine collection for crystal evaluation, and once they received the results, they could discuss diet or fluid intake changes or possible medication to prevent kidney stones. (*Id.*) Defendant LoBue reviewed the chart note on April 26, 2018 and requested follow-up with Dr. Mynatt in six weeks. (*Id.*; Doc. 44-1 at 114.) On April 30, 2018, LoBue's request for an offsite referral for an ultrasound was approved. (Doc. 44-1 at 4.)

On May 16, 2018, Plaintiff saw Defendant LoBue, sometime after he had the carotid ultrasound. (Doc. 37-1 at 7.) LoBue noted that the carotid ultrasound impression was "extensive atherosclerotic plaque formation" bilaterally that was causing moderate (50-

69%) stenosis of the right common carotid and the left common and internal carotid arteries. (*Id.*) The same day, LoBue entered a note on Plaintiff's Continuous Progress Record that states, "Why has 24 hour urine collection ordered 4/26/218 not been done? Do ASAP." (*Id.*) On May 30, 2018, Plaintiff saw Defendant LoBue and complained of bilateral kidney pain. (Doc. 44-1 at 32.) LoBue noted that Plaintiff had a history of kidney stones and requested that he be sent to the emergency room for further evaluation. (*Id.*) Plaintiff was seen at the emergency room and discharged the next day. (*Id.*) It appears from the available medical records that LoBue did not examine or treat Plaintiff after May 30, 2018.[9]

Plaintiff's records indicate that between December 6, 2018 and November 11, 2019, he was treated for the following: heart disease, hypotension, "dizziness and giddiness," chest pain, occlusion and stenosis of the carotid artery, tremor, pain, atherosclerosis of the renal artery, tachycardia, calculus of the kidney, and urinary calculus. (Doc. 44-2 at 54.) On December 6, 2018, Provider Loucas requested an offsite referral for Plaintiff to follow-up with the cardiologist.[10] (Doc. 44-1 at 118.)

On January 3, 2019, after Plaintiff filed the Complaint in this case, he drafted an HNR stating that on February 2, 2018, he had submitted an HNR regarding pain in both arms and numbness in his hands. (Doc. 37-2 at 4.) Plaintiff wrote in the January 3 HNR that he had been referred to Defendant LoBue, but LoBue had not seen him. (*Id.*) Plaintiff also wrote that Dr. Scappatura, who had performed the bypass surgery on Plaintiff's femoral arteries, had told Plaintiff that he probably had a blockage in his upper torso. (*Id.*) Plaintiff wrote that Dr. Kokseng had "ordered test to be done," but LoBue had "cancelled" the test on March 1, 2018.[11] (*Id.*)

---

[9] The record contains no medical records, HNRs, or other documents concerning Plaintiff's medical care between May 30, 2018 and December 6, 2018.

[10] On April 18, 2019, Provider Loucas noted that Plaintiff had been following up with Dr. Bokhari every six months for his cardiomyopathy and that follow-up would "help" because Plaintiff was "at high risk for [a] cardiac event." (Doc. 44-1 at 117.) The request was approved on April 22, 2019. (*Id.*)

[11] The January 3, 2019 HNR is not signed by any medical staff or prison official.

On January 4, 2019, Plaintiff was called to the Medical Unit. (Doc. 37 at 4.) A nurse took Plaintiff's blood pressure, which was 200/103. (*Id.*) The nurse performed an EKG and told Plaintiff she wanted "Dr. Lucas" to see the results.[12] (*Id.*) Dr. Lucas reviewed the EKG and instructed the nurse to put Plaintiff in an observation room and to have him monitored. (*Id.*) The next morning, Plaintiff was transported to the emergency room for further evaluation of hypotension. (Doc. 44-1 at 34.) Hospital staff performed an EKG, drew blood for testing, and took x-rays of Plaintiff's chest. (Doc. 37 at 4.) Plaintiff was discharged from the hospital on January 6, 2019, and he returned to the Huachuca Medical Unit, where he stayed until January 7, 2019. (*Id.*; Doc. 44-1 at 34.) On January 8, 2019, Plaintiff had a "three minute" consultation with Dr. Lucas, who told Plaintiff he did not have a heart attack and stated, "You have arthritis." (Doc. 37 at 4.) The results of the EKG and blood tests that were conducted have not been explained or made available to Plaintiff. (*Id.*)

Between June 17, 2019 and November 21, 2019, Plaintiff was sent offsite for office visits nine times. (Doc. 44-1 at 4.) On June 17, 2019, non-party Provider J.M. Sanabia requested an offsite referral for Plaintiff to see a cardiologist for dizziness and left side head pain. (*Id.* at 120.) The request was approved on June 20, 2019. (*Id.*) On July 10, 2019, Sanabia requested an offsite referral for Plaintiff to undergo an ultrasound for the occlusion and stenosis of the carotid artery. (*Id.* at 7.) Sanabia noted in the request that Plaintiff had increasing episodes of "intense" left sided head pain with dizziness, pain in his left neck, and confusion for the previous three to four months. (*Id.*) Sanabia also noted that Plaintiff reported "palpitations with episodes." (*Id.*) Sanabia's request was approved on July 11, 2019. (*Id.*)

On July 15, 2019, Plaintiff was transported to the hospital emergency room for

_____

(Doc. 37-2 at 4.)

[12] It appears that Plaintiff is referring to Provider A. Loucas. (Doc. 44-1 at 34.) In his February 11, 2019, Motion to Reopen Discovery, Plaintiff identifies Lucas as "N.P. Lucas" and alleges that Lucas "refused to see" him on January 4, 2019. (Doc. 23 at 2.) Plaintiff also claimed in the Motion that CCS "medical personnel" had refused to discuss this "cardiac event" with Plaintiff, withheld the blood test results, and not discussed with EKG results. (Doc. 23 at 3.)

"seizure like activity with dizziness." (Doc. 44-2 at 12.) He was discharged the same day. (Doc. 44-1 at 36.) On August 8, 2019, Provider Sanabia requested an urgent offsite referral for Plaintiff to see a neurologist for "new acute onset of intense left head pain" causing blurry vision, dizziness, tachycardia, high blood pressure, and "whole body tremors." (*Id.* at 123.) The request was approved the same day. (*Id.*) Sanabia also requested an offsite referral for Plaintiff to see a cardiologist following a carotid ultrasound that was scheduled for August 30, 2019. (*Id.* at 126.) That request was approved the same day. (*Id.*)

On September 5, 2019, Provider Sanabia requested three offsite referrals for Plaintiff. First, Sanabia requested an offsite referral for Plaintiff to see orthotics for his pain and tremors. (*Id.* at 45.) The request was approved on September 10, 2019. (*Id.*) Second, Sanabia requested that Plaintiff undergo an MRI of his brain due to pain and "acute tremors." (*Id.* at 10; Doc. 44-2 at 22.) Sanabia noted that Plaintiff had "newly acquired tremors" and had been seen at the emergency room and by a neurologist for treatment. (Doc. 44-1 at 11.) That request was approved on September 6, 2019. (*Id.*) Third, Sanabia requested that Plaintiff be seen by a neurologist for "EEG awake and asleep" studies. (*Id.* at 48-49.) The request was approved on September 6, 2019. (*Id.* at 48.)

On September 13, 2019, Plaintiff was transported to the hospital emergency room for further evaluation of tachycardia and tremors and was discharged the same day. (Doc. 44-2 at 11; Doc. 44-1 at 38.) On September 17, 2019, Provider Sanabia requested an offsite referral for Plaintiff to undergo a renal ultrasound for his renal artery atherosclerosis. (Doc. 44-1 at 13.) The request was approved on September 19, 2019. On September 28, 2019, Plaintiff again was transported to the hospital emergency room for further evaluation of a "syncope episode." (Doc. 44-2 at 10.) He was discharged the same day. (Doc. 44-1 at 40.)

On September 30, 2019, Provider Sanabia requested an offsite referral for Plaintiff to undergo an echocardiogram and a stress test for his tachycardia and occlusion and stenosis of the carotid artery. (Doc. 44-1 at 17, 19.) Sanabia's requests were approved on October 1, 2019. (*Id.* at 17, 19.) Sanabia also requested an offsite referral for Plaintiff to

see a urologist for follow-up after the CT of the renal arteries was completed. (*Id.* at 54.) The request was approved on October 1, 2019. (*Id.*)

On November 5, 2019, Provider Sanabia requested that Plaintiff be seen by Orthotics for a splint fitting due to his dizziness, balance issues, and tremors. (Doc. 44-2 at 9; Doc. 44-1 at 42.) The request was approved the next day. (Doc. 44-1 at 42.) On November 11, 2019, Sanabia requested an offsite referral for Plaintiff to undergo an "urgent" CT urogram. (Doc. 44-1 at 22.) The request was approved on November 12, 2019. (*Id.*) On November 20, 2019, Sanabia requested that Plaintiff be seen offsite by a cardiologist for a cardiac stress test and an echocardiogram. (*Id.* at 19-20.)

On November 25, 2019, Dr. Carrea requested an offsite referral for Plaintiff to see a nephrologist for his kidney calculus and reports of constant pain in the kidneys bilaterally, which radiated anteriorly on the right side. (Doc. 44-1 at 60.) The request was approved on November 28, 2019. (*Id.*) On December 5, 2019, Provider Sanabia requested a durable medical equipment referral for Plaintiff to receive a splint. (Doc. 44-2 at 9.) On December 9, 2019, Sanabia requested that Plaintiff be seen offsite by radiology for an "urgent" CT urogram. (*Id.* at 18.) At some point, Sanabia requested that Plaintiff be seen offsite for a bilateral renal ultrasound, an MRI of Plaintiff's brain with and without contrast, a carotid ultrasound, and a carotid ultrasound bilateral duplex. [13] (*Id.* at 21-25.)

**IV.    Discussion**

To support a medical care claim under the Eighth Amendment, a prisoner must demonstrate "deliberate indifference to serious medical needs." *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006) (citing *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)). There are two prongs to the deliberate-indifference analysis: an objective standard and a subjective standard. First, a prisoner must show a "serious medical need." *Jett*, 439 F.3d at 1096

---

[13] Plaintiff's medical records indicate that each referral that was requested and approved between July 10, 2019 and October 1, 2019 was marked as "complete," but it is unclear whether Plaintiff ever had the offsite appointments or underwent the requested testing. (Doc. 44-1 at 7, 10, 13, 48, 54, 123, 127.) In addition, it is unclear whether Plaintiff was sent offsite for any of the specialist visits or testing that was requested and approved between November 5, 2019 and December 9, 2019.

(citations omitted). A "'serious' medical need exists if the failure to treat a prisoner's condition could result in further significant injury or the 'unnecessary and wanton infliction of pain.'" *McGuckin v. Smith*, 974 F.2d 1050, 1059–60 (9th Cir. 1992), *overruled on other grounds by WMX Techs., Inc. v. Miller*, 104 F.3d 1133, 1136 (9th Cir. 1997) (en banc) (internal citation omitted).

Second, a prisoner must show that the defendant's response to that need was deliberately indifferent. *Jett*, 439 F.3d at 1096. "Prison officials are deliberately indifferent to a prisoner's serious medical needs when they deny, delay, or intentionally interfere with medical treatment." *Hallett v. Morgan*, 296 F.3d 732, 744 (9th Cir. 2002) (internal citations and quotation marks omitted); *see also Wood v. Housewright*, 900 F.2d 1332, 1334 (9th Cir. 1990) (quoting *Hutchinson v. United States*, 838 F.2d 390, 394 (9th Cir. 1988)). Deliberate indifference may also be shown where prison officials fail to respond to a prisoner's pain or possible medical need. *Jett*, 439 F.3d at 1096. "In deciding whether there has been deliberate indifference to an inmate's serious medical needs, [courts] need not defer to the judgment of prison doctors or administrators.'" *Colwell v. Bannister*, 763 F.3d 1060, 1066 (9th Cir. 2014) (quoting *Hunt v. Dental Dep't*, 865 F.2d 198, 200 (9th Cir. 1989)).

Deliberate indifference is a higher standard than negligence or lack of ordinary due care for the prisoner's safety. *Farmer v. Brennan*, 511 U.S. 825, 835 (1994). "Neither negligence nor gross negligence will constitute deliberate indifference." *Clement v. California Dep't of Corr.*, 220 F. Supp. 2d 1098, 1105 (N.D. Cal. 2002); *see also Broughton v. Cutter Labs.*, 622 F.2d 458, 460 (9th Cir. 1980) (mere claims of "indifference," "negligence," or "medical malpractice" do not support a claim under § 1983). "A difference of opinion does not amount to deliberate indifference to [a plaintiff's] serious medical needs." *Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir. 1989). A mere delay in medical care, without more, is insufficient to state a claim against prison officials for deliberate indifference. *See Shapley v. Nevada Bd. of State Prison Comm'rs*,

766 F.2d 404, 407 (9th Cir. 1985). The indifference must be substantial. The action must rise to a level of "unnecessary and wanton infliction of pain." *Estelle*, 429 U.S. at 105.[14]

### A. Erno

Defendants argue that Plaintiff has no claim against Erno because she is not a medical provider, and Plaintiff "has no proof that she did anything that prevented Plaintiff from receiving appropriate medical treatment." (Doc. 26 at 6.) In response, Plaintiff contends that Erno was aware of the "many delays and cancelations" of appointments with nurses and providers that Plaintiff had endured. (Doc. 35 at 8.) Plaintiff further asserts that Erno had knowledge of Plaintiff's mini-strokes (TIAs) and renal stenosis, and, as the final policymaking authority for CCS at Huachuca Unit, Erno had knowledge of Dr. Kokseng's request regarding Plaintiff's renal stenosis, carotid stenosis, TIAs, and "other stenosis." (*Id.* at 8-9.) Plaintiff also claims Erno knew that Defendant LoBue had closed Dr. Kokseng's request for a CT scan, thereby denying Plaintiff proper diagnostic testing and treatment for his medical needs. (*Id.* at 9.) Plaintiff asserts that Erno did nothing to correct LoBue's violation of Plaintiff's rights. (*Id.*)

Plaintiff has not pointed to any evidence in the record that Defendant Erno was personally involved in any of Plaintiff's medical treatment. Rather, Plaintiff appears to base his claim against Erno on her responses to Plaintiff's letters and grievances; her position as Defendant LoBue's supervisor; and her position as a "final policymaking authority" for CCS.

### 1. Failure to Act

Under Ninth Circuit law, a defendant can be liable for failure to act. *Taylor*, 880 at 1045. A defendant's knowledge of a serious medical need or substantial risk to health "is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence," and a defendant may be found to have known of a substantial risk if the risk was obvious. *Farmer*, 511 U.S. at 842. The Court "may conclude that a

---

[14] Because the Court concludes no Defendant acted with deliberate indifference to Plaintiff's serious medical needs, the Court need not consider whether Plaintiff demonstrated harm caused by any indifference. *See Jett*, 439 F.3d at 1096.

prison official knew of a substantial risk from the very fact that the risk was obvious." *Id.*
"[O]bviousness is not measured by what is obvious to a layman, but rather by what would
be obvious 'in light of reason and the basic general knowledge that a prison official may
be presumed to have obtained regarding the type of deprivation involved." *Lemire v. Cal.
Dep't of Corr. & Rehab.*, 726 F.3d 1062, 1078 (9th Cir. 2018). In addition, "a prison
official may be held liable under the Eighth Amendment if [s]he knows that inmates face
a substantial risk of serious harm and disregards that risk by failing to take reasonable
measures to abate it." *Farmer*, 511 U.S. at 847. Thus, the Court must consider whether,
in responding to Plaintiff's letters and grievances, Defendant Erno was deliberately
indifferent to Plaintiff's serious medical needs.

There is no evidence in the record that Defendant Erno is a physician or has any
medical training. Erno avers in her declaration that as a Health Services Administrator for
CCS (now Wellpath Care), she routinely reviews prisoners' medical records and
investigates prisoner grievances concerning their healthcare. (Doc. 27-1 at 2 ¶ 1-3.) Erno's
responses to Plaintiff's letters and grievances demonstrate that she did not make any
decisions concerning Plaintiff's treatment, including approving or denying any request for
specialist care or treatment, and instead relied on Plaintiff's medical records and the
professional medical judgment of his providers in addressing Plaintiff's concerns. It was
not inappropriate for Erno to rely on Plaintiff's providers' judgment regarding Plaintiff's
treatment. *See Peralta v. Dillard*, 744 F.3d 1076, 1086-87 (9th Cir. 2014) (defendant not
aware of risk of harm where he was not a dentist, he did not independently review medical
chart before signing off on appeal and had no expertise to contribute to a review, and he
relied on dental staff who investigated the plaintiff's complaints).

Plaintiff asserts that Erno was aware that multiple appointments had been canceled
or rescheduled, but there is no evidence in the record that Erno was responsible for
canceling or rescheduling any of those appointments. The Court finds that in responding
to Plaintiff's letters and grievances, Erno did not disregard his serious medical needs.
There is no other evidence in the record that Erno was personally involved in Plaintiff's

medical care or that she had knowledge of a substantial risk of harm to Plaintiff's health. Indeed, there is no evidence in the record that Plaintiff communicated with Erno at all after April 13, 2018. Thus, the Court finds there is no genuine dispute of material fact regarding whether Erno failed to respond to Plaintiff's serious medical needs.

### 2. Supervisor Liability

There is no respondeat superior liability under § 1983, and, therefore, a defendant's position as the supervisor of persons who allegedly violated a plaintiff's constitutional rights does not impose liability. *Monell v. New York City Dep't of Social Servs.*, 436 U.S. 658, 691-92 (1978); *Taylor*, 880 F.2d at 1045. However, a supervisor may be liable for failure to act. *See Maxwell v. Cnty. of San Diego*, 708 F.3d 1075, 1086 (9th Cir. 2013) (a supervisor may be liable if he participated in or directed the violation or he knew of the violation and failed to act to prevent it); *cf. Starr v. Baca*, 652 F.3d 1202, 1207–08 (9th Cir. 2011) ("[a] plaintiff may state a claim against a supervisor for deliberate indifference based upon the supervisor's knowledge of and acquiescence in unconstitutional conduct by his or her subordinates").

There is no evidence in the record that Defendant Erno was in any way involved in Defendant LoBue's treatment of Plaintiff. Plaintiff wrote to Erno in the March 23, 2018, Inmate Letter that Dr. Kokseng had "ordered the appropriate test," which had been approved in September 2017, but the medical unit had canceled those orders. Plaintiff did not state in the Inmate Letter that *LoBue* had canceled any orders. But even if Erno was aware that LoBue closed Dr. Kokseng's request for a CT scan of Plaintiff's brain, that alone is insufficient to support a conclusion that Erno was sufficiently personally involved in LoBue's decision, that Erno "directed" LoBue's decision, or that Erno knew of LoBue's decision and failed to act to prevent it. *Maxwell*, 708 F.3d at 1086. Accordingly, the Court finds there is no genuine dispute of material fact concerning Erno's liability as a supervisor.

### 3. Policymaker Liability

Plaintiff claims Defendant Erno had knowledge of Dr. Kokseng's "requests" because she was the final policymaking authority for CCS at Huachuca Unit. However,

there is no evidence in the record to support Plaintiff's assertion that Erno has any authority to determine CCS policy. Moreover, Plaintiff does not point to any evidence in the record that establishes that Erno *in fact* created or promulgated any policy that was the moving force behind any of Plaintiff's injuries. The Court finds there is no genuine dispute of material fact concerning Erno's liability as a policymaker. Accordingly, the Court will grant Defendants' Motion for Summary Judgment with respect to Defendant Erno.

### B.  LoBue

The evidence in the record indicates that Defendant LoBue closed Dr. Kokseng's request for a recommended CT scan of Plaintiff's brain, noting that the request had "been stagnant" and that a review showed Plaintiff had experienced "no further dizziness over the past 10 months." The available medical records confirm that Plaintiff did not complain of dizziness again before LoBue closed the request. Furthermore, LoBue noted that another doctor had deferred requesting the CT scan three months after Dr. Kokseng recommended it; there is no evidence in the record concerning the decision to defer the CT scan. Based on the available evidence, the Court finds it was not unreasonable for LoBue to close a 10-month old request for a test to address a symptom that Plaintiff had not shown since the request was made.

LoBue also reasonably responded to Plaintiff's serious medical needs. When Plaintiff complained of frequent urination, suprapubic pain, nausea, and blood in his urine, LoBue ordered a urine sample to be sent for urinalysis. LoBue also reviewed and signed off on reports from Plaintiff's December 30, 2017 hospital visit, March 5, 2018 stent placement surgery, and follow-up visits with specialists, and ensured Plaintiff was scheduled for further follow-up. LoBue submitted referral requests for offsite services for Plaintiff to receive recommended specialist treatment. (*Id.* at 34.) There is no evidence in the record that LoBue had any authority to approve or deny any recommended specialist treatment or consultation. Finally, LoBue did not examine or treat Plaintiff after May 30, 2018, and there is no evidence in the record to support that any of Plaintiff's subsequent health problems were the result of LoBue's prior care. The Court finds there is no genuine

dispute of material fact concerning whether LoBue was deliberately indifferent to Plaintiff's serious medical needs. Accordingly, the Court will grant Defendants' Motion for Summary Judgment as to Defendant LoBue.

### C. CCS

Defendants argue that Plaintiff has no proof that CCS has a policy of refusing to refer prisoners to outside specialists, and furthermore, his own medical records demonstrate that if an examination by an external physician was required, Plaintiff was examined by external physicians. (Doc. 26 at 6.) In response, Plaintiff notes that the CT scan Dr. Kokseng requested in May 2017 was never performed, and "the conditions of the TIAs continue." (Doc. 35 at 8.)

To prevail on a claim against CCS as a private entity serving a traditional public function, Plaintiff must meet the test articulated in *Monell*. 436 U.S. at 690-94. *See also Tsao v. Desert Palace, Inc.*, 698 F.3d 1128, 1139 (9th Cir. 2012) (applying *Monell* to private entities acting under color of state law). Accordingly, Plaintiff must show that an official policy or custom caused the constitutional violation. *Monell*, 436 U.S. at 694. To make this showing, he must demonstrate that (1) he was deprived of a constitutional right; (2) CCS had a policy or custom; (3) the policy or custom amounted to deliberate indifference to Plaintiff's constitutional right; and (4) the policy or custom was the moving force behind the constitutional violation. *Mabe v. San Bernardino Cnty., Dep't of Pub. Soc. Servs.*, 237 F.3d 1101, 1110-11 (9th Cir. 2001). Further, if the policy or custom in question is an unwritten one, the plaintiff must show that it is so "persistent and widespread" that it constitutes a "permanent and well settled" practice. *Monell*, 436 U.S. at 691 (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 167-68 (1970)).

The Court has found that Plaintiff's constitutional rights were not violated by the treatment he received from LoBue, the only remaining Defendant who personally participated in Plaintiff's medical care. In addition, the Court finds that between May 2018 and December 2019, Plaintiff received extensive specialist evaluation, testing, and treatment for each of his conditions. Plaintiff points to only one instance of a requested

test not being performed: the CT scan Dr. Kokseng requested in May 2017. That sole instance does not outweigh the extensive specialist treatment he did receive. Although Plaintiff claims his TIA symptoms continue, based on this record, the Court finds that Plaintiff did not suffer any constitutional injury as a result of the treatment he received. Therefore, the Court finds there is no genuine dispute of material fact concerning whether a CCS policy or custom resulted in any injury to Plaintiff. The Court will grant Defendants' Motion for Summary Judgment with respect to CCS.

**IT IS ORDERED:**

(1)     The reference to the Magistrate Judge is **withdrawn** as to Defendants' Motion for Summary Judgment (Doc. 26).

(2)     Defendants' Motion for Summary Judgment (Doc. 26) is **granted**, and the action is terminated with prejudice. The Clerk of Court must enter judgment accordingly.

Dated this 17th day of January, 2020.

_Michael T. Liburdi_
Michael T. Liburdi
United States District Judge